# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Richard Ralph and Eugenia Ralph, Appellants,

v.

Paul Dennis McLaughlin and Susan Rode McLaughlin, Respondents.

Appellate Case No. 2017-000866

---

Appeal From Charleston County
Roger M. Young, Sr., Circuit Court Judge

---

Opinion No. 5681
Heard May 15, 2019 – Filed August 21, 2019

---

## REVERSED AND REMANDED

---

G. Dana Sinkler, of Gibbs & Holmes, of Wadmalaw
Island, and Ainsley Fisher Tillman, of Ford Wallace
Thomson LLC, of Charleston, both for Appellants.

George Hamlin O'Kelley, III, of Buist Byars & Taylor,
LLC, of Mt. Pleasant, for Respondents.

---

**GEATHERS, J.:** This case involves a property dispute on Seabrook Island between neighbors Richard and Eugenia Ralph ("the Ralphs"), and Paul and Susan McLaughlin ("the McLaughlins"). The dispute in question concerns the destruction of a drainage easement by the McLaughlins that, the Ralphs allege, exacerbated drainage issues on the Ralphs' property. At trial, the jury found for the Ralphs on their cause of action for trespass and awarded them $1,000 in nominal damages. On appeal, the Ralphs argue the circuit court erred in 1) failing to apply the rulings and

factual determinations from a previous grant of summary judgment to a third-party defendant as the law of the case; 2) entering a directed verdict for the McLaughlins on the issue of punitive damages; 3) failing to find the McLaughlins trespassed as a matter of law; and 4) failing to grant the Ralphs a new trial absolute, a new trial *nisi additur*, or a new trial on damages. We reverse and remand the case for a new trial on compensatory damages and punitive damages.

### FACTS

In 1984, E.M. Seabrook, Jr. prepared and recorded a plat depicting blocks 32 and 33 of Seabrook Island ("the Seabrook plat"). In 1987, he similarly prepared and recorded a second plat depicting blocks 32 and 33. To alleviate drainage issues concerning several lots on block 32, Seabrook established a twenty-foot-wide drainage easement and a corresponding no-build area across the back of lots 21 through 28, which are reflected in the plats. The plats also reflect a twenty-foot-wide drainage easement running between the property lines of lots 21 and 22, extending ten feet into each lot. The drainage easements contained a pipe that began at the front corner of lot 22, ran down the property line, turned ninety degrees, and extended across lots 22 through 28 before emptying into a water hazard on the neighboring golf course.[1]

In 1997, the Ralphs purchased lot 23 and recorded their deed, which granted them the property "with, all and singular, the Rights, Members, Hereditaments and Appurtenances to the said Premises belonging, or in anywise incident or appertaining." The deed also indicated the property was subject to "the Covenants, Conditions, Restrictions, Limitations, Affirmative Obligations and Easements of Record . . . ." Similarly, in 1998 or 1999, Carroll and Lorraine Gantz ("the Gantzes") purchased lot 22 and recorded their deed. The Gantzes' deed indicated lot 22 was subject to "a twenty[-]foot (20') easement for drainage and a ten[-]foot (10') easement for drainage as shown on the [Seabrook plat]," as well as "the area designated as 'No Build Area' shown on the [Seabrook plat]."

In 2002, the Gantzes, predecessors in title to the McLaughlins, approached the Seabrook Island Property Owners Association ("SIPOA") about eliminating the twenty-foot drainage easement and no-build area on the back of lot 22. Thereafter, SIPOA unanimously voted to give the easement back to the owners of lot 22. On September 11, 2002, a new plat prepared by Forsberg Engineering ("the Forsberg plat") entitled "Plat Showing Abandonment of an Existing 20' Drainage Easement

---

[1] Lots 23 through 28 are downstream from lot 22.

Lot 22, Block 32," was recorded. The Forsberg plat also indicated the current no-build area was to be abandoned.

In October 2002, the Gantzes conveyed lot 22 to the McLaughlins, and the deed was recorded. The legal description of the property indicated that it remained subject to the ten-foot drainage easement depicted in the Forsberg plat and "all Restrictions, Covenants, Easements, Rights-of-Way, Matters and Conditions of record affecting said property . . . ." Mr. McLaughlin indicated he never discussed the twenty-foot easement with the Gantzes or SIPOA prior to closing, but he maintained that the real estate agent asserted the easement had been abandoned.[2] Mr. McLaughlin also testified his closing attorney brought the twenty-foot easement to his attention before indicating that it had been abandoned, telling him "everything was appropriate and in order."

In 2006, the McLaughlins approached SIPOA's Architectural Review Board about building a house on their property. According to the plans, part of the house was to be sited over the twenty-foot easement and no-build area. At an August 15, 2006 SIPOA meeting, the preliminary plans were unanimously approved subject to several stipulations.[3] Thereafter, the McLaughlins received a letter from the administrator of the Architectural Review Board, dated August 18, 2006, stating:

> The Architectural Review Board has approved the Preliminary Plans submitted for Block 32 Lot 22, Seabrook Island, SC. Please address the following comments of the ARB and re-submit plans for Conditional Review.
>
> 1. Owner is to assume all responsibility for the underground drainage line at the 20' drainage easement/driveway.[4]

---

[2] However, Mr. McLaughlin conceded that the real estate agent had never shown him any documents concerning the abandonment of the easement.

[3] These stipulations are identical to the comments included in the letter from the administrator of the Architectural Review Board. *See infra.*

[4] In a later lawsuit, SIPOA indicated it "defined the 'cost necessary to remove the easement' to be the cost of re-working the drainage in a manner that maintains the existing drainage for other related lots, i.e., the cost of installing alternative drainage in a manner that will not undermine or adversely affect such existing drainage system 'downstream.'" Mr. McLaughlin indicated he understood this to mean the

2. Owner is to assume all responsibility for the abandoned drainage easement that may contain a pipe.
3. Property lines must be located prior to any grading because of the Right-Of-Way for the SIPOA 20' drainage easement.

In June 2007, the McLaughlins received a letter from SIPOA regarding a plan to address the drainage pipe and eliminate the twenty-foot easement. The Ralphs received the same letter. After receiving the letter, Mr. Ralph met with John Thompson, the executive director of SIPOA, to voice his objections regarding any plans to remove the drainage pipe.

Over the course of the next year, the McLaughlins sought financing for their construction, closing on a loan in June 2008. At some point, the McLaughlins received a call from the chair of the SIPOA legal committee indicating there were some issues concerning the drainage pipe. On September 22, 2008, Thompson sent an email to the owners of lots 21 through 28 seeking to schedule a meeting concerning the easement. The email summarized the dispute surrounding the easement[5] and indicated the drainage pipe was still functioning. The email further indicated that several neighbors objected to the removal of the pipe due to concerns over adverse effects it would have on drainage and that SIPOA had hired an engineer, Robert George, to evaluate the consequences of removing the pipe.[6]

The meeting between SIPOA, the McLaughlins, and the affected property owners was held on September 29, 2008. At the meeting, Mr. George presented his findings and advised against removing the drainage pipe on lot 22, indicating that doing so would increase the likelihood of flooding and exacerbate existing drainage problems. Another meeting was held to discuss the issue on October 1, 2008. Following the meetings, several emails were exchanged between the affected property owners and the McLaughlins. In these emails, the property owners continued to express their concerns about the adverse impact the removal of the pipe

---

McLaughlins, "bore the financial responsibility of taking care of removing [the pipe] if [they] wanted to."

[5] In his email, Thompson indicated SIPOA had voted to give the easement back to the property owners, but only two had chosen "to take the formal action to remove the easement from the recorded documents at the [c]ounty record[]s office . . . ."

[6] Additionally, the email contained an attached report prepared by Mr. George advising against the removal of the drainage pipe on lot 22.

would have on their properties, and the McLaughlins adamantly denied the existence of an easement on their lot. After the McLaughlins and their neighbors failed to reach an agreement, SIPOA indicated it had exhausted its options. On October 22, 2008, SIPOA sent a letter to the affected property owners indicating that it had rescinded the May 2002 resolution abandoning the easement.

On December 5, 2008, the McLaughlins emailed the neighboring property owners asserting that there was no easement on their property, they had been patient with SIPOA, and they would begin construction on their home. On December 9, 2008, the McLaughlins authorized their construction team to remove the drainage pipe. On the same day, SIPOA filed a lawsuit against the McLaughlins seeking a temporary restraining order to prevent the removal of the pipe.[7] However, SIPOA withdrew the lawsuit two days later on December 11, 2008.[8] Following the removal of the pipe, the McLaughlins built part of their home over the no-build area and the area formerly containing the pipe.

On September 30, 2011, the Ralphs filed a complaint[9] against the McLaughlins seeking actual and punitive damages and alleging the McLaughlins caused flooding and poor drainage on the Ralphs' property by destroying the drainage easement. On December 6, 2011, the McLaughlins filed an answer and a third-party complaint against SIPOA alleging reliance on representations by SIPOA. On February 14, 2014, the Ralphs moved for partial summary judgment on their trespass claim. The McLaughlins filed a motion for summary judgment on February 19, 2014, and, a day later, SIPOA filed a motion for summary judgment. While these motions were pending, the Ralphs moved to strike the matter from the docket pursuant to Rule 40(j) of the South Carolina Rules of Civil Procedure (SCRCP),[10] and the parties entered into a consent order striking the case from the docket on June 24, 2014. The Ralphs moved to restore the case to the active docket on May 11,

---

[7] It is unclear whether the McLaughlins removed the pipe before the filing of the lawsuit. The lawsuit was filed at 11:40 a.m., and Mr. Ralph testified the pipe was removed around 2:00 or 3:00 p.m. However, Mr. McLaughlin testified the pipe was removed before the lawsuit was filed.

[8] In his deposition, Thompson indicated the lawsuit was withdrawn as moot because the pipe had already been removed.

[9] The Ralphs filed an amended complaint on July 17, 2013, pleading trespass, punitive damages, and intentional infliction of emotional distress.

[10] Pursuant to Rule 40(j), "[a] party may strike its complaint . . . from any docket one time as a matter of right, provided that all parties adverse to that claim . . . agree in writing that it may be stricken . . . ."

2015, and the case was restored by consent order on June 23, 2015, pursuant to Rule 40(j), SCRCP.[11]

After the case was restored, the parties refiled their motions for summary judgment. On May 11, 2016, the Honorable G. Thomas Cooper, Jr.,[12] heard all three motions for summary judgment, denying both the Ralphs' motion and the McLaughlins' motion. However, Judge Cooper granted SIPOA's motion for summary judgment, finding there was no evidence to show SIPOA had made any promises to the McLaughlins and, as a matter of law, the McLaughlins could not have reasonably relied on SIPOA.

At trial, the Ralphs presented Howard Yates as an expert in real property. Yates indicated that he examined the chains of title for the Ralphs and McLaughlins and opined that both properties became subject to the drainage easement after the properties were first purchased according to the Seabrook Island plat. Yates explained the lot owners each held a special property interest in the easement. Yates further testified SIPOA could not unilaterally abandon the easement, indicating abandonment would require the consent of everyone who held a special property interest. Additionally, while Yates conceded that lot 22 was subject to the Forsberg plat, he maintained that it was still subject to the earlier plats as well. Yates further testified that determining whether SIPOA had authority to abandon the easement would require an attorney to look at the deed and plats and that such a review would only take twenty to thirty minutes.

The Ralphs also presented Robert George as an expert in civil engineering, registered land surveying, and storm-water drainage. George testified that the Ralphs' yard is a trough and the original design for Seabrook Island was meant to alleviate this issue. George further explained this design was interrupted by the McLaughlins' removal of the pipe, leading to increased water flow into the Ralphs' yard, increased "ponding,"[13] and poor drainage. Additionally, Mrs. Ralph indicated the standing water in their yard could reach a depth of eight inches and could take several days to drain, whereas the water would typically dissipate within a day and a half before removal of the pipe.

---

[11] Pursuant to Rule 40(j), "[u]pon being restored, the case shall be placed on the General Docket and proceed from that date as provided in this rule."

[12] While Judge Cooper ruled on the motions for summary judgment, the rest of the case was before the Honorable Roger M. Young, Sr.

[13] The term "ponding" was used to describe the accumulation of standing water as a result of poor surface absorption caused by the high water table on Seabrook Island.

Concerning damages, the Ralphs estimated their house was worth $775,000 without the backyard ponding issues. After removal of the pipe, both of the Ralphs testified that they believed the value of their property had dropped by at least $200,000. The Ralphs also presented Nick Thompson as an expert in commercial and residential appraisal. Thompson indicated he had trouble appraising the Ralphs' property because he had not been able to find any sales with a similar problem. According to Thompson, the lack of comparable sales indicated that either the Ralphs' drainage problems were unique and a similar situation had never existed before or property owners with the same problems had not been able to find a buyer. Thompson then estimated the Ralphs' property had decreased in value by ten, fifty, or sixty percent. Thompson further indicated he believed the Ralphs' property to be worth approximately $567,000 before the pipe was removed, opining that the Ralphs would be lucky to sell their property for half that price afterwards. Additionally, Mrs. Ralph testified that they had paid Mr. George $17,000 in an attempt to alleviate the drainage problem, but no solution could be implemented.

After the Ralphs rested their case, the McLaughlins moved for a directed verdict on several issues, including punitive damages. The Ralphs argued Mr. McLaughlin's testimony indicated that he acted with reckless disregard for the rights of his neighbors.[14] The circuit court indicated it did not think punitive damages were applicable because Mr. McLaughlin believed he had the right to remove the pipe. Ultimately, the circuit court found, "I don't think he was acting malevolently, certainly not to the level of clear and convincing, so I'll grant their motion for punitive damages."

After this ruling, the Ralphs made two additional arguments in support of punitive damages. First, the Ralphs argued that, under South Carolina law, a purchaser is imputed with knowledge of all the other deeds in his chain of title and the act of digging up the pipe could be construed as willful because the McLaughlins are presumed to have known the easement ran across their property. The circuit court responded, "Well, I got to disagree with you on that. That's language in the deed. I doubt there's probably anybody in this room, including all the lawyers, who read the deed when they bought their piece of property. They had their lawyer read it, and it's there." Second, the Ralphs argued the conclusion in Judge Cooper's unappealed grant of summary judgment—that the McLaughlins could not rely on

_____

[14] Mr. McLaughlin testified he attended the SIPOA meeting where Mr. George presented his findings, was aware removing the pipe could have adverse effects on the downstream lots, and proceeded with construction despite the concerns of his neighbors.

any representations by SIPOA—was the law of the case. As such, the Ralphs argued this conclusion should be binding, and they should be allowed to argue to the jury that the removal of the pipe was intentional and punitive damages applied. However, the circuit court ruled the grant of summary judgment to SIPOA was not binding on the jury. After dismissing these arguments, the circuit court reiterated that it was granting the directed verdict on punitive damages.

The McLaughlins' case centered on the theory that they had justifiably relied on SIPOA and the purported abandonment of the easement in removing the pipe. The McLaughlins also testified they had observed significant amounts of standing water in the Ralphs' yard when visiting their property prior to construction. Additionally, Mr. McLaughlin explained that when determining where to site their house, SIPOA's Architectural Review Board required the McLaughlins to preserve a large oak tree in the middle of their property. As such, the McLaughlins had the option to site the house on the front or back side of the oak tree, and they ultimately decided to site the house on the back side.[15] Mr. McLaughlin further indicated he removed the pipe because he was frustrated; he had not asked any of his neighbors for permission to remove the pipe or begin construction; and following construction, he told SIPOA that it could take on the responsibility of providing a solution to the Ralphs' drainage problem.

After the close of the McLaughlins' case, the Ralphs moved for a directed verdict on trespass, arguing SIPOA's purported abandonment of the drainage easement would not have affected the Ralphs' property rights. The circuit court denied the motion, finding the issues of trespass and abandonment were both for the jury. After closing arguments, the circuit court charged the jury on, among other things, the law of easements, trespass, abandonment, and nominal damages. After deliberating for about five hours, the jury indicated it was deadlocked, and the circuit court issued an *Allen*[16] charge. After resuming deliberations for a little over an hour, the jury returned the following verdict: "We, the jury, find for the plaintiff against the defendant in the amount of $1,000 actual nominal[17] damages . . . ."

On February 3, 2017, the Ralphs moved for, in the alternative, a new trial absolute, a new trial as to damages, or a new trial *nisi additur* pursuant to Rule 59, SCRCP. In denying the motions for a new trial absolute and a new trial *nisi additur*,

---

[15] The drainage easement and no-build area ran along the back side of the property.
[16] *Allen v. United States*, 164 U.S. 492 (1896).
[17] The verdict form only had a space for actual damages, but the jury wrote in the word nominal underneath.

the circuit court found it was the jury's intention to award nominal damages and that such an award was supported by the evidence at trial. Additionally, in denying the motion for a new trial as to damages, the circuit court cited the same rationale and indicated a new trial as to damages was not warranted because a directed verdict on the issue of trespass would not have been proper. This appeal followed.

## ISSUES ON APPEAL

1. Did the circuit court err by failing to apply the rulings and factual determinations in the previous grant of summary judgment to SIPOA as the law of the case?

2. Did the circuit court err by entering a directed verdict for the McLaughlins on the issue of punitive damages?

3. Did the circuit court err in failing to find the McLaughlins trespassed as a matter of law?

4. Did the circuit court err in failing to grant the Ralphs a new trial absolute, a new trial *nisi additur*, or a new trial on damages?

## STANDARD OF REVIEW

Directed Verdict

"In reviewing [] a motion for directed verdict . . . , the appellate court applies the same standard as the circuit court." *Hollis v. Stonington Dev., LLC*, 394 S.C. 383, 394, 714 S.E.2d 904, 910 (Ct. App. 2011) (second alteration in original) (quoting *Mishoe v. QHG of Lake City, Inc.*, 366 S.C. 195, 200, 621 S.E.2d 363, 366 (Ct. App. 2005)). As such, "this [c]ourt must view the evidence and all reasonable inferences from the evidence in the light most favorable to the party opposing the motion." *Fairchild v. S.C. Dep't of Transp.*, 398 S.C. 90, 99, 727 S.E.2d 407, 411 (2012). "In essence, we must determine whether a verdict for a party opposing the motion would be reasonably possible under the facts as liberally construed in his favor." *Hurd v. Williamsburg Cty.*, 353 S.C. 596, 608, 579 S.E.2d 136, 142 (Ct. App. 2003). "The appellate court will reverse the [circuit] court's ruling on a [directed verdict] motion only when there is no evidence to support the ruling or where the ruling is controlled by an error of law." *Zinn v. CFI Sales & Mktg., Ltd*, 415 S.C. 93, 108–09, 780 S.E.2d 611, 619 (Ct. App. 2015) (second alteration in original) (quoting *Law v. S.C. Dep't of Corr.*, 368 S.C. 424, 434–35, 629 S.E.2d 642, 648 (2006)).

New Trial

"A [circuit court]'s order granting or denying a new trial upon the facts will not be disturbed unless [its] decision is wholly unsupported by the evidence[] or the conclusion was controlled by an error of law." *Curtis v. Blake*, 392 S.C. 494, 500, 709 S.E.2d 79, 82 (Ct. App. 2011) (quoting *Folkens v. Hunt*, 300 S.C. 251, 254–55, 387 S.E.2d 265, 267 (1990)). "Review by an appellate court of the grant or denial of a new trial is 'limited to consideration of whether evidence exists to support the [circuit] court's order.'" *Id*. at 505–06, 709 S.E.2d at 85 (quoting *Lane v. Gilbert Constr. Co., Ltd.*, 383 S.C. 590, 597, 681 S.E.2d 879, 883 (2009)). "In deciding whether to assess error to a court's denial of a motion for a new trial, we must consider the testimony and reasonable inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Vinson v. Hartley*, 324 S.C. 389, 405, 477 S.E.2d 715, 723 (Ct. App. 1996); *Umhoefer v. Bollinger*, 298 S.C. 221, 224, 379 S.E.2d 296, 297 (Ct. App. 1989).

New Trial *Nisi Additur*

"The denial of a motion for a new trial *nisi* is within the [circuit court]'s discretion and will not be reversed on appeal absent an abuse of discretion." *Vinson*, 324 S.C. at 406, 477 S.E.2d at 723. "This [c]ourt has the duty to review the record and determine whether there has been an abuse of discretion amounting to an error of law." *Id*. at 406, 477 S.E.2d at 723–24. "We will only reverse if the [circuit court] abused [its] discretion in deciding a motion for new trial *nisi additur* to the extent that an error of law results." *Green v. Fritz*, 356 S.C. 566, 570, 590 S.E.2d 39, 41 (Ct. App. 2003). "The [circuit court] who heard the evidence and is more familiar with the evidentiary atmosphere at trial possesses a better-informed view of the damages than this [c]ourt. Accordingly, great deference is given to the [circuit court]." *Vinson*, 324 S.C. at 405–06, 477 S.E.2d at 723 (internal citation omitted). "Therefore, on appeal of the denial of a motion for a new trial *nisi,* this [c]ourt will reverse when the verdict is grossly inadequate or excessive requiring the granting of a new trial absolute." *Id*. at 406, 477 S.E.2d at 724.

## LAW/ANALYSIS

### I. Law of the Case

The Ralphs argue the circuit court erred in failing to apply the findings of fact and conclusions of law in the grant of summary judgment to SIPOA as the law of the case. The McLaughlins argue the circuit court properly refused to apply the findings of fact and conclusions of law in Judge Cooper's summary judgment order

as the law of the case because there was no ruling in his order applying to the Ralphs and McLaughlins; Judge Cooper denied the summary judgment motions of the Ralphs and the McLaughlins; and Judge Cooper ruled on the issue of indemnity, not trespass or punitive damages. We agree with the Ralphs.

"An unappealed ruling is the law of the case and requires affirmance." *Shirley's Iron Works, Inc. v. City of Union*, 403 S.C. 560, 573, 743 S.E.2d 778, 785 (2013); *see also Berry v. McLeod*, 328 S.C. 435, 442, 492 S.E.2d 794, 798 (Ct. App. 1997) ("There is no appeal from this ruling, and thus, it becomes the law of the case."). "Where no exception is taken to findings of fact or conclusions of law, they become the 'law of the case.'" *Walters v. Canal Ins. Co.*, 294 S.C. 150, 151, 363 S.E.2d 120, 121 (Ct. App. 1987) (quoting *Ashy v. WeCare Distribs., Inc.*, 289 S.C. 526, 528, 347 S.E.2d 123, 125 (Ct. App. 1986)). "The law of the case applies both to those issues explicitly decided and to those issues [that] were necessarily decided in the former case." *Ross v. Med. Univ. of S.C.*, 328 S.C. 51, 62, 492 S.E.2d 62, 68 (1997). "This State has a long-standing rule that one judge of the same court cannot overrule another." *Shirley's*, 403 S.C. at 573, 743 S.E.2d at 785.

In *Shirley's*, our supreme court found that previous unappealed orders by separate judges did not constitute the law of the case because the issues in question were distinctly different. *Id*. In so holding, the supreme court found that neither of the previous unappealed orders specifically ruled on the issue in question. *Id*. Similarly, in *Binkley v. Burry*, this court found that a previous judge's unappealed order in regard to notice of the existence of an easement did not constitute the law of the case concerning notice of the scope of the easement. 352 S.C. 286, 294–95, 573 S.E.2d 838, 843 (Ct. App. 2002). The *Binkley* court held, "the question of notice regarding the existence of an easement is distinct from the question of notice as it relates to the scope and enforceability of the easement." *Id*. at 294, 573 S.E.2d at 843. The court further held that while "the law of the case doctrine may preclude [] challenging [the] finding that the Binkleys did not have notice of the scope and enforceability of the easement, the doctrine does not prevent [] raising the issue of when the Binkleys had notice of the existence of the easement." *Id*. at 294–95, 573 S.E.2d at 843.

Here, Judge Cooper's grant of summary judgment made explicit rulings and findings of fact concerning the McLaughlins. Specifically, Judge Cooper ruled "as a matter of law, there is simply no genuine issue of material fact that the McLaughlins reasonably relied on the unambiguous acts, representations, and writings of SIPOA or otherwise reasonably based their decision to remove the pipe in 2008 . . . ." Judge Cooper's grant of summary judgment was not appealed. As such, the finding that the McLaughlins could not claim reliance on SIPOA in

removing the pipe was the law of the case. *See Shirley's*, 403 S.C. at 573, 743 S.E.2d at 785 ("An unappealed ruling is the law of the case and requires affirmance.").

The issue of whether the McLaughlins could rely on SIPOA is the exact issue the Ralphs raised to the circuit court in arguing that Judge Cooper's order constituted the law of the case. Accordingly, we find the circuit court erred in ruling that Judge Cooper's findings were not binding on the court and the jury. We note the McLaughlins' defense was significantly based on the theory that they were acting in reliance on SIPOA. Moreover, the circuit court's decision to grant the directed verdict on punitive damages was based largely on its determination that the McLaughlins believed they had the right to remove the pipe based on SIPOA's representations. We address the impact of this error below.

## II.    Punitive Damages

The Ralphs argue the circuit court erred in granting a directed verdict as to punitive damages because more than one reasonable inference could be drawn from the evidence as to whether the McLaughlins acted with reckless disregard for the property rights of the Ralphs. We agree.

<u>Preservation</u>

At the outset, the McLaughlins argue this issue is not preserved because the Ralphs did not raise the issue of punitive damages in their post-trial motions and did not object when the directed verdict was granted. We disagree.

"It is well-settled that an issue cannot be raised for the first time on appeal, but must have been raised to and ruled upon by the [circuit] court to be preserved for appellate review." *Staubes v. City of Folly Beach*, 339 S.C. 406, 412, 529 S.E.2d 543, 546 (2000). "The losing party must first try to convince the lower court it has ruled wrongly and then, if that effort fails, convince the appellate court that the lower court erred." *I'On, L.L.C. v. Town of Mt. Pleasant*, 338 S.C. 406, 422, 526 S.E.2d 716, 724 (2000). "Without an initial ruling by the [circuit] court, a reviewing court simply would not be able to evaluate whether the [circuit] court committed error." *Staubes*, 339 S.C. at 412, 529 S.E.2d at 546. "If the losing party has raised an issue in the lower court, *but the court fails to rule upon it*, the party must file a motion to alter or amend the judgment in order to preserve the issue for appellate review." *I'On*, 338 S.C. at 422, 526 S.E.2d at 724 (emphasis added); *see also Elam v. S.C. Dep't of Transp.*, 361 S.C. 9, 24, 602 S.E.2d 772, 780 (2004) ("A party *must* file such a motion when an issue or argument has been raised, *but not ruled on*, in order to preserve it for appellate review." (second emphasis added)). "Imposing this

preservation requirement on the appellant is meant to enable the lower court to rule properly after it has considered all relevant facts, law, and arguments." *I'On*, 338 S.C. at 422, 526 S.E.2d at 724. However, "[p]ost-trial motions are not necessary to preserve issues that have been ruled upon at trial . . . ." *Wilder Corp. v. Wilke*, 330 S.C. 71, 77, 497 S.E.2d 731, 734 (1998). As such, the mere fact that a party received an unfavorable ruling does not require that party to re-raise the issue in a Rule 59(e) motion to preserve it. *See Eubank v. Eubank*, 347 S.C. 367, 373 n.2, 555 S.E.2d 413, 416 n.2 (Ct. App. 2001) ("The 'raised to and ruled on' rule of error preservation requires only a ruling, *not necessarily a favorable one*." (emphasis added)).

The issue of punitive damages was raised to the circuit court when the McLaughlins moved for a directed verdict. In opposing the motion, the Ralphs argued that evidence in the record supported the inference that the McLaughlins acted recklessly, that the McLaughlins had imputed knowledge of the easement through their chain of title, and that the law of the case precluded the McLaughlins from claiming reliance on SIPOA. *See I'On*, 338 S.C. at 422, 526 S.E.2d at 724 ("The losing party must first try to convince the lower court it is has ruled wrongly and then, if that effort fails, convince the appellate court that the lower court erred."). After hearing arguments from both sides, the circuit court granted a directed verdict in favor of the McLaughlins. *See Staubes*, 339 S.C. at 412, 529 S.E.2d at 546 ("Without an initial ruling by the [circuit] court, a reviewing court simply would not be able to evaluate whether the [circuit] court committed error."). Accordingly, because this issue was raised to and ruled upon by the circuit court, the Ralphs were not required to make an objection or raise the issue in a post-trial motion to preserve it for appellate review. *See I'On*, 338 S.C. at 422, 526 S.E.2d at 724 ("If the losing party has raised an issue in the lower court, *but the court fails to rule upon it*, the party must file a motion to alter or amend the judgment in order to preserve the issue for appellate review." (emphasis added)); *Wilder Corp.*, 330 S.C. at 77, 497 S.E.2d at 734 ("Post-trial motions are not necessary to preserve issues that have been ruled upon at trial . . . .").

Merits

The Ralphs argue the circuit court erred in failing to submit the issue of punitive damages to the jury. The McLaughlins argue the circuit court properly granted a directed verdict on punitive damages because there was no evidence to support the inference that the McLaughlins acted recklessly, willfully, or wantonly. We agree with the Ralphs.

"The purposes of punitive damages are to punish the wrongdoer and deter the wrongdoer and others from engaging in similar reckless, willful, wanton, or

malicious conduct in the future." *Wimberly v. Barr*, 359 S.C. 414, 423, 597 S.E.2d 853, 858 (Ct. App. 2004). "Punitive damages may be awarded for trespass when a defendant's acts have been willful, wanton or in reckless disregard of the rights of another." *Id.*; *see also Hinson v. A. T. Sistare Constr. Co.*, 236 S.C. 125, 131, 113 S.E.2d 341, 344 (1960) ("Trespass through mere negligence affords no ground for punitive damages; but such damages may be awarded whe[n] the trespass is wil[l]ful and deliberate."), *overruled on other grounds by McCall by Andrews v. Batson*, 285 S.C. 243, 329 S.E.2d 741 (1985). "'Recklessness implies the doing of a negligent act knowingly'; it is a 'conscious failure to exercise due care.'" *Berberich v. Jack*, 392 S.C. 278, 287, 709 S.E.2d 607, 612 (2011) (quoting *Yaun v. Baldridge*, 243 S.C. 414, 419, 134 S.E.2d 248, 251 (1964)). "If a person of ordinary reason and prudence would have been conscious of the probability of resulting injury, the law says the person is reckless or willful and wanton, all of which have the same meaning—the conscious failure to exercise due care." *Id.* Moreover, "[a] jury may award punitive damages even 'when the wrongdoer does not actually realize that he is invading the rights of another, provided the act is committed in such a manner that a person of ordinary prudence would say that it was a reckless disregard of another's rights.'" *Fairchild v. S.C. Dep't of Transp.*, 385 S.C. 344, 353–54, 683 S.E.2d 818, 823 (Ct. App. 2009) (quoting *Camp v. Components, Inc.*, 285 S.C. 443, 444, 330 S.E.2d 315, 316 (Ct. App. 1985)).

"When ruling on a directed verdict motion as to punitive damages, 'the circuit court must view the evidence and the inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party.'" *Hollis*, 394 S.C. at 393–94, 714 S.E.2d at 909–10 (quoting *Mishoe*, 366 S.C. at 200, 621 S.E.2d at 366). "It is not the duty of the [circuit] court to weigh the testimony in ruling on a motion for a directed verdict." *Fairchild*, 398 S.C. at 99, 727 S.E.2d at 411. Rather, "[t]he issue of punitive damages must be submitted to the jury if more than one reasonable inference can be drawn from the evidence as to whether the defendant's behavior was reckless, willful, or wanton." *Hollis*, 394 S.C. at 394, 714 S.E.2d at 910 (quoting *Mishoe*, 366 S.C. at 201, 621 S.E.2d at 366). Once the issue has been submitted to the jury, "the plaintiff has the burden of proving [punitive] damages by clear and convincing evidence." S.C. Code Ann. § 15-33-135 (2005). Accordingly, in ruling on a directed verdict motion as to punitive damages, the circuit court must determine whether there are any reasonable inferences from the evidence to support the conclusion that the defendant's behavior was reckless. If such an inference can be made, the issue should be submitted to the jury, who in turn must determine whether recklessness was proven by clear and convincing evidence.

As referenced above, this court has previously addressed when the issue of punitive damages must be submitted to the jury in *Mishoe* and *Hollis*. In *Mishoe*, the plaintiff suffered serious injuries to her left ankle and right knee when her foot got caught in a hole while walking across the pavement near a hospital's emergency room exit. 366 S.C. at 199, 621 S.E.2d at 365. In determining that the circuit court correctly denied the defendant's motions for a directed verdict and a judgment not withstanding the verdict, this court noted that the chief executive officer of the hospital was provided with actual, written notice of the hole almost a year before the plaintiff's accident. *Id*. at 201, 621 S.E.2d at 366. The court then stressed that, despite such notice, the hospital took no action to repair the hole or to warn visitors or patients of its existence. *Id*. at 201–02, 621 S.E.2d at 366. Accordingly, the court determined "evidence of this written notice [was] sufficient to submit the issue of [Defendant]'s willful, wanton, reckless, or malicious conduct to the jury." *Id*. at 202, 621 S.E.2d at 366.

In *Hollis*, this court again found that the circuit court properly denied a directed verdict on the issue of punitive damages. 394 S.C. at 390, 714 S.E.2d at 907–08. In the case, the defendant purchased property directly upstream from the plaintiffs for the purpose of developing a residential subdivision. *Id*. at 390, 714 S.E.2d at 908. As a result of the defendant's development, the plaintiffs experienced severe flooding on their property that inhibited access to their home and filled their ponds with up to four feet of sediment. *Id*. In determining the issue was correctly submitted to the jury, the *Hollis* court noted that the defendant "ignored regulations regarding erosion control, stormwater runoff, and even its own engineer's plans; took no action to prevent or correct damage it knew it was causing to the ponds; and used threats and deception to avoid the consequences of its misconduct." *Id*. at 394, 714 S.E.2d at 910. The court then highlighted the circuit court's summary of the evidence, finding that the plaintiffs had expressed concerns about the development's effects on their property both before and during construction, the South Carolina Department of Health and Environmental Control and Richland County had put the defendant on notice that it was not maintaining its stormwater management plan, the defendant inadequately maintained the stormwater management system, and the defendant attempted to bully and threaten the plaintiffs. *Id*. After reviewing the record, the *Hollis* court found that the circuit court "correctly denied the motion because, viewing the evidence in the light most favorable to the [plaintiffs], the jury had ample evidence from which to find [defendant] acted in reckless disregard of the rights of others." *Id*. at 395, 714 S.E.2d at 910.

We find the decision to grant the directed verdict was based on an error of law, as the circuit court's determination that the McLaughlins justifiably relied on

SIPOA's representations in removing the pipe was in direct contravention of Judge Cooper's determinations of law.[18] *See Zinn*, 415 S.C. at 108–09, 780 S.E.2d at 619 ("The appellate court will reverse the [circuit] court's ruling on a [directed verdict] motion [] when . . . the ruling is controlled by an error of law." (second alteration in original) (quoting *Law*, 368 S.C. at 434–35, 629 S.E.2d at 648)). However, even absent Judge Cooper's ruling, the circuit court should have submitted the issue of punitive damages to the jury.

First, the jury could have found the McLaughlins knew or should have known that their downstream neighbors had property interests in the drainage easement and no-build area before the McLaughlins removed the pipe and built their house. Mr. McLaughlin indicated he relied on the representations of his real estate agent and did not speak to SIPOA about the existence of the easement before purchasing the property. However, under South Carolina law, the McLaughlins had a duty to inquire into the property rights in the easement, as they are presumed to have knowledge of the recorded easements in their chain of title. *See Moyle v. Campbell*, 126 S.C. 180, 193–94, 119 S.E. 186, 190 (1923) ("The law imputes to a purchaser of real estate notice of the recitals contained in the written instruments[] forming his chain of title *and charges him with the duty of making such reasonable inquiry and investigation* as is suggested by the recitals and references therein contained." (emphasis added) (internal citations omitted)); *Binkley v. Rabon Creek Watershed Conservation Dist. of Fountain Inn*, 348 S.C. 58, 71, 558 S.E.2d 902, 909 (Ct. App. 2001) ("Notice of a deed is notice of its whole contents . . . and *it is also notice of whatever matters one would have learned by any inquiry which the recitals of the instrument made it one's duty to pursue*." (alteration in original) (quoting 66 C.J.S. *Notice* § 19, at 454 (1998))); *Harbison Cmty. Ass'n, Inc. v. Mueller*, 319 S.C. 99, 103, 459 S.E.2d 860, 863 (Ct. App. 1995) ("A homeowner is charged with constructive notice of any restriction properly recorded within the chain of title.").[19] Additionally, SIPOA notified the McLaughlins that if they removed the drainage pipe, they bore the responsibility of doing so in a manner that maintained the drainage system for the downstream lots. Despite receiving such notice and hearing the objections of their neighbors, the McLaughlins refused to acknowledge the

---

[18] *See supra* Section I.

[19] As such, we do not agree that the circuit court's contention that most people do not read their deeds overcomes this presumption, particularly when considering Mr. Yates's testimony that an attorney could have discovered the easement after twenty to thirty minutes of searching the title. *See Moyle*, 126 S.C. at 194, 119 S.E. at 190 ("Generally the means of knowledge and the duty of using them are equivalent to knowledge.").

existence of the easement. Finally, Mr. McLaughlin conceded that he authorized his contractors to remove the pipe after getting "frustrated" with SIPOA's inability to provide a solution that allowed the McLaughlins to build their house as sited. Therefore, when viewing the facts in the light most favorable to the Ralphs, we find the jury could have determined that a person of ordinary reason and prudence would have been on notice that the McLaughlins' downstream neighbors had property interests in the drainage easement. Thus, the jury could have reasonably found that the McLaughlins acted in conscious disregard of the rights of their downstream neighbors in removing the drainage pipe and building in the no-build area. *See Berberich*, 392 S.C. at 287, 709 S.E.2d at 612 ("'Recklessness implies *the doing of a negligent act knowingly*'; it is a 'conscious failure to exercise due care.'" (emphasis added) (quoting *Yaun*, 243 S.C. at 419, 134 S.E.2d at 251)); *id.* ("If a person of ordinary reason and prudence would have been conscious of the probability of resulting injury, the law says the person is reckless or willful and wanton, all of which have the same meaning—the conscious failure to exercise due care.").

Second, even if the McLaughlins believed they had the right to remove the pipe, this would not preclude a jury from finding that they acted recklessly. *See Fairchild*, 385 S.C. at 353–54, 683 S.E.2d at 823 ("A jury may award punitive damages even 'when the wrongdoer does not actually realize that he is invading the rights of another, provided the act is committed in such a manner that a person of ordinary prudence would say that it was a reckless disregard of another's rights.'" (quoting *Camp*, 285 S.C. at 444, 330 S.E.2d at 316)). At trial, Mr. McLaughlin acknowledged that he was aware several of his neighbors had raised concerns about the removal of the pipe. Mr. McLaughlin also acknowledged that he attended the meeting where Mr. George gave his presentation and understood removing the pipe would have adverse effects on his neighbors' properties. Finally, Mr. McLaughlin testified that the McLaughlins could have sited their house on the front or back side of the oak tree in the middle of their lot. However, the McLaughlins never attempted or offered to site the house on the front side, which would have left the drainage easement intact. When taking these facts in the light most favorable to the Ralphs, we find the jury could have determined that a person of ordinary reason and prudence would have known that removing the drainage pipe would produce negative consequences for the downstream properties that relied on the drainage easement. Thus, the jury could have reasonably determined that the McLaughlins acted in reckless disregard of the rights of their downstream neighbors by removing the pipe and building in the no-build area. *See Berberich*, 392 S.C. at 287, 709 S.E.2d at 612 ("If a person of ordinary reason and prudence would have been conscious of the probability of resulting injury, the law says the person is reckless or willful and

wanton, all of which have the same meaning—the conscious failure to exercise due care.").

In ruling that a directed verdict was justified, the circuit court indicated it did not think the McLaughlins were acting recklessly or intentionally because it found the McLaughlins reasonably believed they had the right to remove the pipe. The court stressed that it did not "think [the McLaughlins were] acting malevolently, *certainly not to the level of clear and convincing . . . .*" (emphasis added). In so ruling, we find the circuit court invaded the jury's province by improperly weighing the evidence. *See Fairchild*, 398 S.C. at 99, 727 S.E.2d at 411 ("It is not the duty of the [circuit] court to weigh the testimony in ruling on a motion for a directed verdict."). Because a reasonable juror could have found the McLaughlins acted recklessly in either 1) removing the pipe and building in the no-build area when they knew or should have known that their neighbors had property interests in the drainage easement or 2) removing the pipe with knowledge that it would adversely affect their neighbors' properties, the circuit court erred by not submitting punitive damages to the jury. *See Hollis*, 394 S.C. at 394, 714 S.E.2d at 910 ("The issue of punitive damages must be submitted to the jury if more than one reasonable inference can be drawn from the evidence as to whether the defendant's behavior was reckless, willful, or wanton." (quoting *Mishoe*, 366 S.C. at 201, 621 S.E.2d at 366)).

## III.    Directed Verdict on Trespass

The Ralphs argue the circuit court erred in failing to grant a directed verdict on the issues of abandonment and trespass because both were questions of law and not fact. The McLaughlins argue both issues were properly submitted to the jury, as they were both questions of fact. We agree with the Ralphs.

"When ruling on a directed verdict motion [], 'the circuit court must view the evidence and the inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party.'" *Hollis*, 394 S.C. at 393–94, 714 S.E.2d at 909–10 (quoting *Mishoe*, 366 S.C. at 200, 621 S.E.2d at 366). "A case should be submitted to the jury when the evidence is susceptible of more than one reasonable inference." *Fairchild*, 398 S.C. at 99, 727 S.E.2d at 411. However, "[o]ur courts have recognized that when only one reasonable inference can be deduced from the evidence, the question becomes one of law for the court." *Hurd*, 353 S.C. at 609, 579 S.E.2d at 143. Thus, "[w]hen the evidence yields only one inference, a directed verdict in favor of the moving party is proper." *Id*. at 609, 579 S.E.2d at 142.

"The unwarrantable entry on land in the peaceable possession of another is a trespass, without regard to the degree of force used, the means by which the enclosure is broken, or the extent of the damage inflicted." *Snow v. City of Columbia*, 305 S.C. 544, 552, 409 S.E.2d 797, 802 (Ct. App. 1991). "The entry itself is the wrong. Thus, for example, if one without license from the person in possession of land walks upon it, or casts a twig upon it, or pours a bucket of water upon it, he commits a trespass by the very act of breaking the enclosure." *Id*. "To constitute an actionable trespass, [] there must be an affirmative act, the invasion of the land must be intentional, and the harm caused must be the direct result of that invasion." *Id*. at 553, 409 S.E.2d at 802. "Intent is proved by showing that the defendant acted voluntarily and that he knew or should have known the result would follow from his act." *Id*. Accordingly, the owner of a servient estate commits trespass by intentionally destroying an easement without the consent of the easement holder. *See* Susan F. French, *Relocating Easements: Restatement (Third), Servitudes § 4.8(3)*, 38 Real Prop. Prob. & Tr. J. 1, 4–5 (2003) (noting the majority rule since the late 19th century has been that "the owner of the servient estate commits trespass by relocating [or destroying] an easement without the consent of the holder of the easement.").

At trial, Mr. McLaughlin conceded that he authorized his contractors to remove the pipe and build part of his home over the easement and no-build area. *See Snow*, 305 S.C. at 553, 409 S.E.2d at 802. ("To constitute an actionable trespass . . . the invasion of the land must be intentional . . . ."). Additionally, Mr. McLaughlin acknowledged that he did not obtain the Ralphs' permission before doing so. *See id*. at 552, 409 S.E.2d at 802 ([I]f one *without license from the person in possession of land* walks upon it . . . he commits a trespass by the very act of breaking the enclosure." (emphasis added)). Thus, upon establishing an ownership interest in the easement, the Ralphs would be entitled to judgment as a matter of law. *See* French, *supra*, at 4–5 ("[T]he owner of the servient estate commits trespass by [destroying] an easement *without the consent of the holder of the easement*." (emphasis added)); *see also Hurd*, 353 S.C. at 609, 579 S.E.2d at 143 ("Our courts have recognized that when only one reasonable inference can be deduced from the evidence, the question becomes one of law for the court."). As we will discuss below, ownership of the drainage easement at the time it was destroyed was a question of law. Therefore, we find the circuit court erred in submitting the issue of trespass to the jury.

The existence of the drainage easement was undisputed at trial. However, the McLaughlins argue any ownership interests in the drainage easement had been extinguished before they removed the pipe because SIPOA had unilaterally

abandoned the easement. Whether SIPOA could effectively abandon the drainage easement turns on the ownership interests in the easement before it was purportedly abandoned. Because determination of such ownership interests was a question of interpreting the Seabrook Plat and subsequent deeds, it was a question of law. *See Slear v. Hanna*, 329 S.C. 407, 410–11, 496 S.E.2d 633, 635 (1998) ("The determination of the existence of an easement is a question of fact . . . [, however, if] the action is viewed as interpreting a deed, *it is an equitable matter* . . . ." (emphasis added) (internal citation omitted)).

"[W]here a deed describes land as is shown on a certain plat, such plat becomes a part of the deed." *Blue Ridge Realty Co. v. Williamson*, 247 S.C. 112, 118, 145 S.E.2d 922, 924 (1965). "[T]he purchaser of lots with reference to the plat of the subdivision acquire[s] every easement, privilege[,] and advantage shown upon said plat . . . ." *Carolina Land Co., Inc. v. Bland*, 265 S.C. 98, 105, 217 S.E.2d 16, 19 (1975); *see also Corbin v. Cherokee Realty Co.*, 229 S.C. 16, 24, 91 S.E.2d 542, 546 (1956) ("Such purchasers acquire[] every easement, privilege[,] and advantage [that] the plat represent[s] as belonging to them."). "It is generally held that when the owner of land has it subdivided and platted into lots and [easements,] and sells and conveys the lots with reference to the plat, he thereby dedicates said [easements] to the use of such lot owners [and] their successors in title . . . ." *Williamson*, 247 S.C. at 118, 145 S.E.2d at 924–25. "[A]s between the owner, who has conveyed lots according to a plat, and his grantee or grantees, the dedication is complete when the conveyance is made . . . ." *Outlaw v. Moise*, 222 S.C. 24, 30, 71 S.E.2d 509, 511 (1952) (citation omitted). "Such an easement is deemed a part of the property to which the grantee is entitled and of which he cannot be divested except by due process of law." *Bland*, 265 S.C. at 106, 217 S.E.2d at 20 (citation omitted). Accordingly, an easement dedicated by plat is an easement appurtenant. *See Tupper v. Dorchester Cty.*, 326 S.C. 318, 325, 487 S.E.2d 187, 191 (1997) ("[A]n appurtenant easement inheres in the land, concerns the premises, has one terminus on the land of the party claiming it, and is essentially necessary to the enjoyment thereof."). Therefore, such easements pass with the dominant estate upon conveyance. *See id.* ("[An easement appurtenant] passes with the dominant estate upon conveyance.").

The Seabrook Plat included the easement and no-build area across lots 21-28. Therefore, the easement was dedicated to the property owners upon conveyance of the lots in question. *See Williamson*, 247 S.C. at 118, 145 S.E.2d at 924–25 ("It is generally held that when the owner of land has it subdivided and platted into lots and [easements,] and sells and conveys the lots with reference to the plat, he thereby dedicates said [easements] to the use of such lot owners [and] their successors in

title . . . ."). As such, we find the Ralphs (as owners of lot 23)—as well as the owners of lots 21, 24, 25, 26, 27, and 28—acquired ownership interests in the drainage easement and no-build area across lot 22 as a matter of law.

Consequently, because the lot owners had property interests in the drainage easement, the question of whether SIPOA's unilateral abandonment was effective was a question of law. "It is [a] well-settled principle that an *owner* of an easement may relinquish that easement by abandonment, express or implied." *Immanuel Baptist Church of N. Augusta v. Barnes*, 274 S.C. 125, 131, 264 S.E.2d 142, 144 (1980) (emphasis added). "The pivotal issue in determining whether there has been an abandonment is the *intention of the owner*." *Id*. (emphasis added). "[Intent to abandon an easement] may be inferred from the acts and conduct of *the owner* and the nature and situation of the property . . . ." *Bland*, 265 S.C. at 109, 217 S.E.2d at 21 (emphasis added). Thus, a third-party cannot unilaterally affect the rights of the easement holder or unilaterally abandon an owner's easement by recording a new plat. *See Corbin*, 229 S.C. at 24, 91 S.E.2d at 546 ("The Florenza Company could not *without the consent of [the owner]* change the location or width of [the easement]." (emphasis added)); *Bland*, 265 S.C. at 107, 217 S.E.2d at 20 ("The fact that a new plat of the property in question was made did not destroy the easement created on the [original] plat.").

Under South Carolina law, it is clear that an easement may only be abandoned by its owner. *See Barnes*, 274 S.C. at 131, 264 S.E.2d at 144 ("It is [a] well-settled principle that an *owner* of an easement may relinquish that easement by abandonment, express or implied." (emphasis added)). As such, SIPOA's purported abandonment of the drainage easement could not affect the Ralphs' interest as a matter of law. *See Bland*, 265 S.C. at 106, 217 S.E.2d at 20 ("Such an easement is deemed a part of the property to which the grantee is entitled and of which he cannot be divested except by due process of law." (citation omitted)). Similarly, the recording of the Forsberg Plat could not affect the Ralphs' interest as a matter of law. *See id*. at 107, 217 S.E.2d at 20 ("The fact that a new plat of the property in question was made did not destroy the easement created on the [original] plat."). Rather, Mr. Yates correctly testified that abandonment of the drainage easement would not be effective unless all of the lot owners with an interest in the easement agreed to the abandonment. *See Barnes*, 274 S.C. at 131, 264 S.E.2d at 144 ("The pivotal issue in determining whether there has been an abandonment is the *intention of the owner*." (emphasis added)). Therefore, we find the circuit court erred in submitting the issue of abandonment to the jury.

Accordingly, because the Ralphs established ownership of the easement as a matter of law and the ineffectiveness of SIPOA's abandonment as a matter of law,

we find the Ralphs were entitled to enforce the easement as a matter of law. Therefore, because Mr. McLaughlin admitted authorizing his contractors to remove the pipe and build over the no-build area, the issue of trespass is susceptible to only one inference and should not have been submitted to the jury. *See Hurd*, 353 S.C. at 609, 579 S.E.2d at 142 ("When the evidence yields only one inference, a directed verdict in favor of the moving party is proper."). As such, we find the circuit court erred in refusing to grant a directed verdict on trespass.

## IV.    New Trial Motions

The Ralphs argue the circuit court erred in denying their motion for a new trial absolute, a new trial on damages, or a new trial *nisi additur* because its judgment and order denying a new trial were characterized by errors of law and the damages award was wholly unsupported by the evidence. As indicated above, the circuit court committed several errors of law, particularly 1) failing to apply Judge Cooper's ruling as the law of the case; 2) granting a directed verdict on punitive damages; and 3) submitting the issues of trespass and abandonment to the jury. As a result of these errors, we agree that the Ralphs are entitled to a new trial.[20]

A new trial is an appropriate remedy when "the verdict is inconsistent and reflects the jury's confusion." *Vinson*, 324 S.C. at 404, 477 S.E.2d at 722. As such, a circuit court must take certain steps to prevent juror confusion. In crafting a jury charge, "[o]nly law applicable to the case should be charged to the jury. Instructions that do not fit the facts of the case may serve only to confuse the jury." *State v. Blurton*, 352 S.C. 203, 208, 573 S.E.2d 802, 804 (2002). Similarly, "it [is] the duty of the [circuit court] to eliminate from the proceedings the questions of law[] and to submit to the jury only questions of fact . . . ." *Duren v. Kee*, 41 S.C. 171, 176, 19 S.E. 492, 494 (1894). Accordingly, when a jury charge consists of irrelevant and inapplicable principles that confuse the jury in a manner affecting the outcome of the trial, it constitutes reversible error. *Cole v. Raut*, 378 S.C. 398, 404, 663 S.E.2d 30, 33 (2008). Likewise, "it is reversible error to charge a correct principle of law as governing a case when such principle is inapplicable to the issues on trial." *Dunsil v. E.M. Jones Chevrolet Co., Inc.*, 268 S.C. 291, 295, 233 S.E.2d 101, 103 (1977).

---

[20] Because we find the Ralphs are entitled to a new trial based on several errors of law, we decline to address their argument that the evidence in the record does not support the jury's nominal damages award. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (noting an appellate court need not address appellant's remaining issues when its determination of a prior issue is dispositive).

When taken together, we find the failure to apply Judge Cooper's order as the law of the case and the failure to grant a directed verdict on trespass likely overburdened and confused the jury, affecting its damages award. The circuit court should have instructed the jury on the law of the case and precluded the McLaughlins from arguing reliance on SIPOA to the jury. Furthermore, because trespass was established as a matter of law, the jury should have only been responsible for determining damages and punitive damages. Instead, the circuit court allowed the McLaughlins to argue reliance to the jury; did not instruct the jury that the McLaughlins could not rely on SIPOA as a matter of law; and submitted the issues of trespass, abandonment, and damages to the jury. *See Blurton*, 352 S.C. at 208, 573 S.E.2d at 804 ("Only law applicable to the case should be charged to the jury."). As such, the jury's role expanded from simply determining damages to ruling on complex questions of law.[21] *See Duren*, 41 S.C. at 175, 19 S.E. at 494 ("[Q]uestions of law do not go to the jury . . . .").

Moreover, by allowing the jury to hear evidence of reliance and rule on the issue of abandonment, the circuit court gave credence to the McLaughlins' theories that 1) the easement could have been abandoned by SIPOA and 2) they justifiably relied on SIPOA's representations that the easement had been abandoned. In turn these theories supported the overall theme of the McLaughlins' case: that they were not responsible for damaging the Ralphs' property because they did not know the easement existed. However, both of these theories are misleading, as SIPOA could not have abandoned the easement as a matter of law and any purported reliance on SIPOA was irrelevant in determining damages.[22] Accordingly, we find the combined effect of these errors likely confused and overburdened the jury in a manner prejudicial to the Ralphs. *See Cole*, 378 S.C. at 404, 663 S.E.2d at 33 ("A jury charge consisting of irrelevant and inapplicable principles may confuse the jury and constitutes reversible error where the jury['s] confusion affects the outcome of the trial."); *Dunsil*, 268 S.C. at 295, 233 S.E.2d at 103 ("[I]t is reversible error to charge a correct principle of law as governing a case when such principle is inapplicable to the issues on trial."); *see, e.g., C. I. T. Corp. v. Corley*, 196 S.C. 339,

---

[21] As indicated above, the issues of abandonment and trespass were both questions of law rather than fact. *See supra* Section III.

[22] Moreover, even though the issue of trespass should not have been submitted to the jury, we note that any purported reliance on SIPOA's representations by the McLaughlins would have also been irrelevant in determining trespass. *See Snow*, 305 S.C. at 553, 409 S.E.2d at 802 ("Although neither deliberation, purpose, motive, nor malice are necessary elements of intent, the defendant must intend the act which in law constitutes [trespass].").

342–43, 13 S.E.2d 440, 441–42 (1941) (reversing a circuit court's order that conflicted with a previous unappealed order constituting the law of the case).

Second, we find the failure to submit the issue of punitive damages to the jury also constitutes reversible error. *See Zinn*, 415 S.C. at 108–09, 780 S.E.2d at 619 ("The appellate court will reverse the [circuit] court's ruling on a [directed verdict] motion [] when there is no evidence to support the ruling or where the ruling is controlled by an error of law." (second alteration in original) (quoting *Law*, 368 S.C. at 434–35, 629 S.E.2d at 648)); *see, e.g.*, *Rhodes v. Lawrence*, 279 S.C. 96, 97–98, 302 S.E.2d 343, 344 (1983) (remanding for a new trial after determining the circuit court erred in granting a directed verdict on punitive damages).

As such, we agree that the Ralphs are entitled to a new trial. However, we find the scope of the new trial can be limited on remand. "The law in South Carolina is clear that when a verdict in favor of a plaintiff is fully supported by the evidence on the issue of liability but the damages awarded are inadequate, a new trial *may* be ordered on the issue of damages alone." *Cartin v. Keller Bldg. Prods. of Charleston*, 299 S.C. 152, 153, 382 S.E.2d 922, 923 (1989). In other words, "[a] new trial on damages alone is not warranted unless the evidence presented indicated that a directed verdict on the issue of liability would have been proper." *Pelican Bldg. Ctrs. of Horry-Georgetown, Inc. v. Dutton*, 311 S.C. 56, 61, 427 S.E.2d 673, 676 (1993); *see also* S.C. Code Ann. § 15-33-125 (2005) ("Unless the plaintiff is entitled to a directed verdict on the issue of liability, any new trial must include both issues of liability and damages.").

As discussed above,[23] we find the Ralphs were entitled to a directed verdict on trespass. Therefore, as the issue of liability has already been established as a matter of law, it is not necessary to remand the case for a new trial absolute. *See* § 15-33-125 ("Unless the plaintiff is entitled to a directed verdict on the issue of liability, any new trial must include both issues of liability and damages."). Accordingly, we remand the case for a new trial on compensatory damages and punitive damages only.

## CONCLUSION

Based on the foregoing, we find the circuit court erred in failing to apply Judge Cooper's ruling as the law of the case, granting a directed verdict on the issue of punitive damages, and submitting the issues of trespass and abandonment to the jury. Accordingly, we reverse the judgment and remand the case for a new trial on

---

[23] *See supra* Section III.

compensatory damages and punitive damages. Furthermore, on remand, Judge Cooper's determination that the McLaughlins could not reasonably rely on SIPOA's representations shall be applied as the law of the case.

**REVERSED AND REMANDED.**

**WILLIAMS and HILL, JJ., concur.**